UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **MARY DOBBINS KATTERHEINRICH,** | ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) Case No.: 5:17-cv-1797-LCB ) ) |
| **AL-RAZAQ COMPUTING SERVICES,** | ) ) ) |
| **Defendant.** | ) ) |

## MEMORANDUM OPINION

Plaintiff Mary Dobbins Katerheinrich filed suit against Defendant Al-Razaq Computing Services for terminating her employment in violation of the False Claims Act (FCA) and Defense Contract Workers Protection Act (DCWPA) on October 25, 2017. (Doc. 1). Defendant moved for summary judgment on September 30, 2019. (Doc. 24). After reviewing the briefs and evidentiary material, Defendant's motion is granted.

I.   FACTUAL BACKGROUND

**A. Plaintiff begins working for Al-Razaq Computing Services**

Defendant Al-Razaq Computing Services "provides support services to commercial enterprises and city, state, and federal government entities." (Doc. 26-1 at 2). Plaintiff Mary Dobbins Katterheinrich began working for Defendant on May

1

1, 2011. (*Id*. at 2). Her position was originally classified as Business Team Lead but was changed to Program Lead on February 25, 2012. (*Id*.). Plaintiff's hiring coincided with Defendant being "awarded Contract Number NNM11AA30C by NASA's Marshall Space Flight Center." (*Id*. at 1). This contract is also referred to as the ABSS1 contract. (*Id*.). As Program Lead, Plaintiff's responsibilities included approving her subordinate's time sheets and filling open positions in her department within 30 days. (*Id*. at 27:3-11; 48:9-16).

### B. Defendant bids on second contract

Defendant's ABSS1 contract with NASA was scheduled to end on April 30, 2016. (Doc. 26-1 at 1). Prior to this, NASA "issued a request for proposal seeking bids" for the new contract that would begin after ABSS1 concluded in February 2016. (*Id*.). The new contract was NNM16534124R, also referred to as the ABSS2 Contract. (Doc. 26-3 at 53:4-9). Defendant did not bid on this new contract alone. Instead, Defendant formed a joint venture with another organization called A Squared Joint Venture (A2JV) to bid on the contract. (*Id*. at 54:3-11). Plaintiff was offered a position with A2JV to help with the bid. (Doc. 32-4 at 4). Her supervisor, Langston Hunter, asked her to assist with the project in early 2016. (Doc. 26-3 at 55:7-14).

Plaintiff did not participate in the proposal because she believed that a potential conflict of interest existed if A2JV would bid on the contract. (*Id*. at 56:11-

21). She informed the team that a conflict of interest could arise under Federal Acquisition Regulations (FAR) and no one else was trying to solve this issue. (*Id*.). Plaintiff understood that a potential organizational conflict of interest (OCI) existed because of her previous position at Digital Fusion Solutions. (*Id*. at 79:2-11). While a Digital Fusion employee, the company bid on a successive contract with NASA while still working on another contract with the organization. (Doc. 26-5 at 2). NASA's Marshall Space Flight Center (MSFC) contracting officer Sherry Fenn notified Digital Fusion that it would be disqualified from bidding on the new contract unless "a firewall [was] used to separate both the information and personnel associated with the current contract from the proposal team associated with the successive contract." (*Id*.).

After relaying her concerns to Hunter and the bid proposal team, he told Plaintiff he would bring her concerns about this potential conflict of interest to corporate leadership. (Doc. 26-3 at 57:18-58:5). Hunter also told Plaintiff he talked to contracting officer Fenn and was informed Plaintiff could work on the new bid proposal. (*Id*. at 59:1-12). However, Plaintiff was still not comfortable proceeding with the bid without talking to another contracting officer. (*Id*. at 59:12-18). Plaintiff then spoke to Fenn's superior, Ketela Helton, about whether an OCI existed. (*Id*. at 85:23-86:10). She brought the disqualification letter to an informal meeting with Helton and Jerry Seaman, MSFC's legal counsel on February 24, 2016. (*Id*. at 86:7-

17; 87:20-22; 93:5-11). She asked Helton and Seaman if Defendant needed to implement a device like a firewall to avoid an OCI. (*Id*. at 89:11-20). Both responded in the affirmative and she asked Helton to notify Hunter and Shanda Williams, another employee that worked on the bid proposal, that Defendant needed to implement a firewall. (*Id*. at 90:17-91:12; 134:15-19). After Plaintiff met with Helton and Seaman, she immediately had "face-to-face" discussions with Hunter and Williams about their conversation. (*Id*. at 97:9-16). When she told Hunter about the need to implement a mitigating procedure like a firewall to reduce the risks of an OCI, he responded that there was no time for the government to review a plan before the proposal was submitted. (*Id*. at 99:18-100:6). Plaintiff also provided Hunter a copy of the government's letter to Digital Fusion, but he refused to take it. (*Id*. at 100:7-12). A2JV proceeded to bid on the new contract and the proposal was delivered to NASA on March 17, 2016. (Doc. 26-6 at 2).

### C. Defendant is disqualified from bidding

Helton, the MSFC Contracting Officer, informed A2JV that it was disqualified from bidding on the ABSS2 contract on May 9, 2016. (*Id*.). Helton explained her decision to disqualify A2JV in a letter. (*See id*.). She believed that the joint venture should not have been awarded the contract because Defendant was obligated "to screen new business opportunities for organizational conflicts of interest and have proposed resolutions for identified OCIs approved by the

4

contracting officer." (*Id*.). Helton's letter also provided that use of a "firewall/restriction on certain individuals would have ensured Al-Razaq used other resources in its preparation of the A2JV proposal." (*Id*.). Ultimately, she concluded that Defendant's participation in the new contract created an unacceptable OCI in violation of the FAR. (*Id*.). A2JV subsequently challenged the dismissal on May 17, 2016, with United States Government Accountability Office (GAO). (Doc. 32-1 at 18). The GAO dismissed A2JV's protest and identified that there was an employee that notified a contracting officer about Digital Fusion's disqualification on August 23, 2016. (*Id*. at 16, 22). A2JV is currently protesting the decision with the Court of Federal Claims. (Doc. 26-4 at 152:19-153:5).

### D. Plaintiff's work performance and termination

Outside of the bidding process, Plaintiff was scrutinized by her superiors about how she performed certain tasks as a supervisor. Brigitte Jenkins, Defendant's Human Resources Manager located in Texas, was first notified about Plaintiff's work performance around June 2016. (Doc. 26-2 at 10:14-17; 80:23-81:3). Linh Nguyen, an employee that manages the timekeeping system, notified Jenkins that Plaintiff had been inaccurately reporting time. (*Id*. at 81:8-13). Jenkins then had a conversation with Plaintiff that she had improperly logged time for one of her employees because she "authorized an employee to log less than 40 hours in one week." (*Id*. at 82:10-17). Hunter also notified Brigitte Jenkins, Defendant's Human

Resources Manager, that he observed a decline in Defendant's performance "in June or July 2016." (Doc. 26-1 at 3) (Doc. 26-2 at 130:11-17). Specifically, he noticed that Plaintiff was slow to fill vacancies in her section around April 2016. (*Id.*). He informed Jenkins that the company's customers were complaining about the number of vacancies that Plaintiff had not yet staffed. (*Id.* at 92:14-19). After her conversation with Hunter, Jenkins investigated these concerns. (Doc. 26-1 at 3). Jenkins discovered that Plaintiff had left many positions vacant over a "four month period between May and August 2016." (*Id.*). If positions were not filled in a timely manner, Defendant would have to give the government a credit because there were no employees to be paid. (Doc. 26-2 at 97:7-15). Plaintiff acknowledged that she made a mistake reporting her subordinate's time incorrectly. (Doc. 32-4 at 3). She was not informed by Hunter or other management personnel that she was filling positions too slowly. (*Id.* at 4). She was also not previously reprimanded for any errors that she made. (*Id.* at 8).

Once Jenkins's investigation concluded, she decided to terminate Plaintiff. (Doc. 26-1 at 3). Plaintiff was fired on August 31, 2016. (Doc. 32-6 at 29). Jenkins, Hunter, and two other of Defendant's personnel attended the meeting. (Doc. 26-3 at 128:6-11). She was told during the meeting that she was being terminated because of the issues with her subordinate's time cards and not filling positions in a timely fashion. (*Id.* at 129:6-12). Two months after she was terminated, Plaintiff filed a

complaint with NASA and alleged that she had been terminated because she was a whistleblower. (*Id*. at 132:22-133:4). She alleged that Defendant terminated her employment arbitrarily because she reported that a conflict of interest may exist when Defendant participated in bidding for the contract. (Doc. 32-2 at 60–61). The NASA Office of Inspector General determined that she wasn't protected under 10 U.S.C. § 2409, or the Defense Contract Workers Protection Act (DCWPA) on May 1, 2017. (*See id*. at 66).

Plaintiff filed a complaint on October 25, 2017. (Doc. 1). She alleged that she was unfairly terminated in violation of the retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h), and the DCWPA, 10 U.S.C. § 2409. (*Id*. at 10–13). Defendant moved for summary judgment on September 30, 2019. (Doc. 24).

## II.     LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  Once

the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party

opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

### III.   DISCUSSION – MOTION FOR SUMMARY JUDGMENT (Doc. 24)

Defendant moves for summary judgment as to Plaintiff's purported protection under 10 U.S.C. § 2409 and 31 U.S.C. § 3730(h). First, Defendant argues that Plaintiff did not engage in a protected activity under 10 U.S.C. § 2409, or the DCWPA. (Doc. 31 at 23).[1] It further contends that Plaintiff's conduct is governed by the "2008 version of the DCWPA, rather than the 2013 version." (*Id.*).

#### A. Claim related to 10 U.S.C. § 2409

##### 1. Protected activity under 10 U.S.C. § 2409

The language of 10 U.S.C. § 2409(a), amended in 2016, provides "employee[s] of a contractor, subcontractor, grantee, or subgrantee or personal services contractor" are protected from retaliation if they report illegal behavior related to a government contract. Specifically, § 2409(a)(B) protects employees who report offenses like "a violation of law, rule, or regulation, related to a [NASA] contract…or grant." The 2008 version of this statute protects similar activity to the present one. However, the present iteration of the statute protects a wider assortment

---

[1] When referencing page numbers of the parties' briefs, the Court uses the page number that is created when the document is electronically filed.

9

of activities related to NASA contracts.[2] The 2008 version is limited in its protection, as it only protects from retaliation employees that report misconduct related to a Department of Defense contract or grant. 10 U.S.C. § 2409(a) (2008).

### 2. Plaintiff did not engage in a protected activity under 10 U.S.C. § 2409

Presumably, Plaintiff engaged in protected conduct under the current version of 10 U.S.C. § 2409 when she reported to Ketela Helton that she believed that a potential OCI would arise if A2JV would continue to bid on the next contract. However, the most recent version of the DCWPA does not apply to Plaintiff's conduct. When the 2008 version of the DCWPA was amended as part of the National Defense Authorization Act, the amendment notes provide that the 2013 statute is "effective on the date that is 180 days after January 2, 2013, and applicable to contracts awarded on or after January 2, 2013." Pub. L. 112-239, Div. A, Title VIII, § 827(a) to (f). Defendant entered into the ABSS1 contract in 2011. (Doc. 26-1 at 1). Accordingly, because the contract was awarded before January 2, 2013, the 2008 version of the DCWPA applies.

Plaintiff contends that she was concerned about potential fraud related to the ABSS2 contract, which was created in 2016. (Doc. 32 at 23). However, the activity that she was concerned about, i.e., the lack of a proper firewall, was related to the

---

[2] The language that added protection for NASA whistleblowers was enacted in January 2013. *See* 10 U.S.C. § 2409 (2013).

ABSS1 Contract. Moreover, Defendant did not enter into the ABSS2 contract. The language of the DCWPA's 2013 amendment notes are clear: the revised statute is applicable to contracts that are *awarded*, not potential contracts. Because the 2008 version of the DCWPA is applicable in this case, Plaintiff did not engage in a protected activity under the statute. Therefore, Defendant's motion for summary judgment as to Count II count is granted.

### B. Claim related to 31 U.S.C. § 3730(h)

Defendant also moves for summary judgment as to Plaintiff's claim that she was unfairly retaliated against in violation of the retaliation provision of the FCA. (Doc. 31 at 25). Defendant argues that Plaintiff's claims fail as a matter of law because she did not engage in conduct protected by the FCA when she reported that there was a potential OCI violation. (*Id.* at 18). Defendant also argues that if Plaintiff did engage in protected conduct, there is not a causal connection between her conduct and termination. (*Id.* at 30). Finally, Defendant posits that even if Plaintiff can satisfy these elements, she cannot overcome its legitimate nonretaliatory reasons for its decision, nor can she establish evidence of pretext. (*Id.* at 33).

### 1. Stating a claim under the FCA

The FCA serves as "the Government's primary litigative tool for combatting fraud." *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1312 (M.D. Ala. 1999) (citing S. Rep. No. 345, at 34 (1986), *reprinted in* 1986 U.S.C.C.A.N.

5266, 5299). The FCA, codified as 31 U.S.C. § 3729, outlaws individuals from knowingly making fraudulent claims to the government. Employees who report suspected violations of the FCA by their employer are generally protected from retaliation under 31 U.S.C. § 3730(h). Without direct evidence of retaliation, a plaintiff can make a *prima facie* case under the FCA by proving: "(1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action." *Mann*, 49 F. Supp. 2d at 1317. *See also Mack v. Augusta-Richmond Cty.*, *Ga.*, 148 F. App'x. 894, 896–97 (11th Cir. 2005). The only disputed elements in this case are whether Plaintiff had engaged in a protected activity and whether there is causal connection between the protected activity and Plaintiff's termination. (*See* Doc. 31 at 23, 30).

### a. Protected activity under the FCA

There are two types of protected activity under 31 U.S.C. § 3730(h)(1): "lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." The first clause of this section[3] provides an avenue for employees to report violations of the statute related to *qui tam* actions. *See Arthurs*

---

[3] The Court refers to "lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section" as the first clause of 31 U.S.C. § 3730(h)(1).

*v. Global TPA LLC*, 208 F. Supp. 3d 1260, 1265 (M.D. Fla. 2015). *Qui tam* actions are filed by a plaintiff on behalf of the government when there is a suspected FCA violation. *See United States ex. rel. Matheny v. Medco Health Sol., Inc.*, 671 F.3d 1217, 1219 n.1 (11th Cir. 2012).

Prior to the addition of the second clause[4] of 31 U.S.C. § 3730(h)(1), the Eleventh Circuit and other district courts identified activity as protected under the FCA when there was a "distinct possibility" of litigation when the employee reported a suspected FCA violation. *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996). *See also United States ex. rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (per curiam) ("If an employee's actions…are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud in a qui tam action…then the complaint states a claim for retaliatory discharge under § 3730(h).")

Plaintiff did not file a *qui tam* action in this case nor does the evidence suggest she anticipated filing a *qui tam* action. However, Plaintiff alleges that she engaged in protected activity under the second clause of 31 U.S.C. § 3730(h)(1): "other efforts to stop 1 or more violations of this subchapter." This clause was added in 2009 "to broaden the protection afforded to those who take action to thwart fraud

---

[4] Likewise, the Court refers to "other efforts to stop 1 or more violations of this subchapter" as the second clause of 31 U.S.C. § 3730(h)(1).

13

committed against the federal government." *Arthurs*, 208 F. Supp. 3d at 1264. While there is not circuit precedent to define what a protected activity is under this section, other courts have found that a party claiming protection under this clause must have an objectively reasonable belief that their employer engaged in fraud. *See Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 752 (E.D. Va. 2017). *See also United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 622 (E.D. Va. 2016). Further, this circuit has applied an objectively reasonable standard when analyzing whether fraud has been committed under other statutes. *See Roberts v. Rayonier, Inc.*, 135 F. App'x. 351, 357 (11th Cir. 2005) (citing *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir. 1997) (Court applying objectively reasonable standard to retaliation under the ADA).

### i. Plaintiff engaged in protected conduct

Construing the facts in the light most favorable to Plaintiff, a reasonable juror could find she had an objectively reasonable belief that there was a potential violation of the FCA if Defendant proceeded to bid on the contract without instituting a firewall or another type of mitigating procedure. Plaintiff relied on information she learned at a previous job to determine that there could be an issue if her suggestions about a firewall were not followed. (Doc. 32-4 at 6). The evidence provides that Plaintiff actively attempted to alert her superiors about these issues and removed herself from the bidding process in response to these fears. (Doc. 26-3 at

56:11-21). She also testified that when she attempted to give Hunter evidence there was a potential issue, he refused to view her letter that advised her former employer of the violation. (*Id*. at 100:7-12). Finally, Plaintiff was advised by a contracting officer and legal counsel from MSFC that Defendant needed to use a firewall when it bid on the new contract. (*See id*. at 89:11-20). As Defendant was actively in the process of bidding on the new contract, a juror could find that Plaintiff had an objectively reasonable belief about potential fraud and she communicated this information "in an effort to stop a potential violation" of the FCA.

### b. Causation under the FCA

To successfully make a prima facie case under the FCA, a plaintiff must also show a causal connection between the protected activity and the adverse employment action. *See Mann*, 49 F. Supp. 2d at 1317. Proving causation under the retaliation clause requires a plaintiff to "show that the retaliation was 'because of' the protected activity." *United States v. HPC Healthcare, Inc.*, 723 F. App'x. 783, 792 (11th Cir. 2018) (citing 31 U.S.C. § 3730(h)(1)). *See also Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x. 785, 792 (11th Cir. 2015) (Court holding that proving causation under the FCA requires "but-for" causation). A plaintiff also must "show that the employer was at least aware of the protected activity." *HPC Healthcare*, 723 F. App'x. at 792 (citing *Sanchez*, 596 F.3d at 1304).

### i. Plaintiff cannot establish a causal connection

Construing the facts in the most favorable light to Plaintiff, there is not a genuine dispute of material fact that there is a causal connection between when she engaged in the protected activity and when she was terminated. First, the undisputed evidence shows that Jenkins was responsible for terminating Plaintiff and she did not have any knowledge about Plaintiff's involvement in bidding on ABSS2. (*See* Doc. 26-1 at 3). Jenkins became aware of Plaintiff's involvement once she filed her NASA whistleblower complaint, which was after her termination. (*Id.*). Additionally, the GAO decision that was released on August 23, 2016, did not identify Plaintiff by name as the employee that reported a potential OCI. (*See* Doc. 32-1 at 16). Plaintiff's attempts to create a genuine dispute of material fact by attributing Hunter's knowledge to Jenkins is uncorroborated by the evidence.[5] While Jenkins provided in her affidavit that her conversation with Hunter prompted her to start the investigation, (Doc. 26-1 at 3), Plaintiff's argument that Jenkins "had no independent knowledge of her job performance" is unsupported. (Doc. 32 at 30). Jenkins testified that another employee, Linh Nguyen, first brought it to her attention that Plaintiff may be improperly authorizing time for her subordinates. (Doc. 26-2 at 81:8-13).

---

[5] Plaintiff attempts to attribute Hunter's feelings about her to Jenkins using a cat's paw theory. However, this theory of liability is not appropriate when using a "but-for" causation standard. *See Reynolds*, 620 F. App'x. at 792. Regardless, as discussed above, another employee had brought Plaintiff's performance to Jenkins attention. Jenkins also reviewed 14 months of Plaintiff's files, which demonstrated Plaintiff had not filled many vacancies. (Doc. 26-1 at 3).

Further, even assuming Jenkins did have knowledge about Plaintiff's involvement in the bidding process, a reasonable juror still could not find there was a causal connection between the protected activity and the adverse employment action. The evidence provides that the bulk of Plaintiff's communications about the potentially faulty bid occurred in February 2016. (*See supra* Part I(B)). Plaintiff was terminated in August 2016, meaning there was about a six-month gap between when she reported the conduct and when she was terminated. Applying a temporal analysis with causation under Title VII retaliation cases, this circuit has found that this long of a gap is not evidence of retaliation. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("We have plainly held that that a plaintiff satisfies [the causal] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action.") *See also Thomas v. Cooper Lighting, Inc.* 506 F.3d 1361, 1364 (11th Cir. 2007) ("[M]ere temporal proximity, without more, must be 'very close'…A three to four month disparity between the statutorily protected expression and adverse employment action is not enough.") (internal citations omitted).

While Plaintiff argues that she made many complaints about the bidding process continually, this is not supported by the evidence. Indeed, even if Plaintiff had continued to complain about the violation, A2JV was disqualified from bidding

17

in May 2016. (*See* Doc. 26-5). If she kept complaining until the disqualification, there were still three months until her termination. Accordingly, a reasonable juror could not find there is a causal connection between Plaintiff's protected activity and her termination. Therefore, Plaintiff has not established a prima facie FCA retaliation case and summary judgment as to Count I is granted. This failure to show causation also supports the granting of summary judgment as to Plaintiff's DCWPA claim.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Doc. 24) is **GRANTED**. An order consistent with this opinion will be entered separately.

**DONE** and **ORDERED** October 1, 2020.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

19